## The Gendron Iron Wheel Co. v. Santschi.

Setting aside a Verdict upon the Weight of the Evidence.

The probative force of the testimony of a witness is the final resultant of all his asserverations bearing upon the matter in question when considered and analyzed with reference to themselves and to known circumstances and facts; and when an issue of fact is submitted to a jury and the testimony on one side is clear, consistent and in harmony with known and settled facts, and the testimony on the other side, though conflicting therewith, is inconsistant with itself and with known or established facts, the case does not present such conflict of testimony as will prevent a reviewing court from setting aside a verdict manifestly erroneous.

Bentley, J. (orally.)

Mr. Santschi recovered a judgment against the Gendron Iron Wheel Company, in the court of common pleas, for $4,500, for an injury suffered by him while employed by the company, by the bursting of an emery wheel.

Various errors are assigned in the petition in error, but none were argued or relied on in this court except those founded upon the claim that the verdict is against the weight of the evidence.

The facts, as claimed by the plaintiff below, are these: On May 4, 1890, the plaintiff, a young man of about twenty-six years of age, had been working for the plaintiff in error for some days about their factory, here in Toledo, where machinery was run and bicycles and other articles were manufactured. His work was not confined to any certain kind of employment, but as he expressed it, he was "working at most everything."

On May 14, he was, by one of the foremen of the company, put to work at an emery wheel running at a high rate of speed, grinding small protuberances or burrs left in casting one of the small iron parts of bicycles, called "binders." He had been thus working nearly all day, having no notice or knowledge of any defect in the emery wheel or of any danger from its swift revolution, and along late in the afternoon the wheel burst, and, its motion being towards him, one of the flying pieces of the wheel hit him on the head and severely injured him. He claims that, in fact, the emery wheel was defective, that a small piece had fallen out of it the day before, while another workman was grinding on it, and that that workman had promptly called the attention of the said foreman to it and had refused to work longer upon it and that, thereupon, the wheel was taken from its place on the left end of the shaft and

placed on the right end of the same shaft and another emery wheel which had up to that time been on the right hand end of the shaft was placed on the left end, in short that said two wheels were changed about, but said defective wheel was allowed to run in its new place, and that the defect was such as would render it dangerous and liable to burst, to the knowledge of the company, and that it did burst by reason of said defect and the high rate of speed at which it was run.

Some question was made as to whether the person who set the plaintiff to work at the wheel (a Mr. Krete) was authorized so to do, and whether his relations to the company were such as that notice to him of the defect in the wheel was notice to the company, but we think this authority and relation were sufficiently shown and there is no contro versy but that plaintiff was injured and by the flying fragments of an emery wheel at which he was working. · The decisive thing is, was the wheel which burst defective as claimed and was Mr. Krete's attention so called to it? The plaintiff in error earnestly contends that, though the jury evidently so found, the great weight and force of the evidence indicates otherwise. And it is perhaps fair and proper that we state the testimony, facts and deductions that make for the support of the claims on each side on this issue.

The plaintiff testified that he went to work at the wheel on the right hand end of the shaft of the machine in question, about eleven o'clock in the morning of the 14th and worked until noon, then quit for dinner and began again at ten minutes to one o'clock and worked some hours till the wheel burst. He says that he did not use the face or periphery of the wheel but ground on the side of it, and did not notice or know of any defect in it, and that he had some experience with emery wheels off and on for four or five years, and was careful, and he says that he didn't let any binder get under the wheel and between that and the iron table of the machine under the wheel. He says that the wheel that he worked on was thicker and smaller in diameter than the one exhibited to the jury, which was an inch thick and fourteen inches in diameter.

The evidence of the defendant below tended to show, and the defendant claims the truth is, that the accident occurred from the plaintiff's allowing many of said binders to lie on the table of the machine and that the slight jar of the machinery would move them about and nothing prevented one of them from coming in contact with the wheel, and that immediately after the accident it was noticed that a part of the wheel that burst still clung to the shaft and showed it to be an inch wheel, and not one and one-half inches thick, and right under the place of the centre of the wheel one of those binders was then sticking up, being lodged in the round draft hole through the table, and on the upper corner as it lay a place was ground off as if by the wheel. This piece of iron, or binder, was exhibited to the court, being attached to the bill of exceptions, and the machine itself, with a fourteen-inch emery wheel, one inch thick, was also exhibited, and it was demonstrated that if such a piece should get into that position under the wheel, while in motion, it would inevitably tear the wheel in pieces or cause it to burst. Several witnesses testified to seeing those binders all over the table while plaintiff was at work and to the fact that the wheel that burst was a fourteen-inch wheel, one inch thick. The man who originally put it in new a few days before says he put this inch wheel on the left side and worked on it there, ground on it the day before Santschi was hurt, and that Hill that day changed it from the left to the right side, and that he and not

Santschi was grinding on it up to the time that Hill changed it. And there was much testimony tending to show that Santschi was not grinding on the machine the 13th, but was at work in the rubber room, and that Barchant was grinding on the 13th where Santschi claimed that he—. Santschi—was. Mr. Hill, who was the man who changed the wheels, according to the testimony on both sides, says he did it so the large wheel could be on the right, as it was handier in grinding mud-guards, and that the fourteen-inch wheel was thus left on the right hand side, and that he had the wheel in his hands and there was no defect that he saw. There was no evidence tending to show that the fourteen-inch wheel was defective, but that persons ground tools on its face several times that day. Mr. Krete denies that his attention was called to any defect in the wheel, but says that if it had been, it would have been his duty to take it off and not suffer it to be run.

The testimony was conflicting as to whether such a defect in the wheel as testified to by Surtman and Hutchinson could have been seen while the wheel was running, but several expert witnesses testified that such a piece being out of a wheel run at such speed as this ran—over 1,500 revolutions per minute—it would throw the wheel out of balance and cause the whole machine to so shake and tremble that no one could avoid noticing it, and it could not be used. There was no testimony contradicting this (except the said testimony of the plaintiff; that he did not notice any such thing, and that of Surtman and Hutchinson, that the piece was out). There was, at least, no claim or proof but that the wheel ran apparently smooth and all right till it burst, with no such jar or shaking of the machine.

To prove the existence of said defect in the wheel, the plaintiff called as a witness one Surtman, a workman then employed about the defendant's shop, who testified that on May 13—the day before the accident—he, Surtman, was engaged in grinding on an emery wheel on the left end of the shaft in question all day until about two, or half-past two o'clock, when he heard a sound as if something had hit a piece of sheet iron; that he then stopped the wheel—not on that account—but to get a drink, and when he came back from getting a drink, he noticed that a piece was broken from the edge or corner of the emery wheel at which he had been grinding, about an inch and a half down on the side of the stone and extending into the face or periphery of the stone about one and one-half inches. That this was about 2:30 P. M. That about three o'clock he called another workman—one Hutchinson—over and showed him where the chunk was out of the wheel and soon after called Mr. Krete's attention to it and refused to work longer at the wheel, thinking it dangerous. That Krete said nothing, but walked off, and soon after the wheels were changed about, by a man named Hill—a sort of subforeman in another room—and that he, Surtman, saw the wheel with the same chunk broken out, on the right-hand end of the shaft, the next day, where the plaintiff was working when hurt.

The plaintiff called the said Hutchinson as a witness, and he testified that on the afternoon before Santschi was hurt, as he was passing where Surtman was at work, he called his attention to a place on the edge of the emery wheel where a chunk had broken out. He describes it about the same as Surtman did and says he told Surtman to be careful and not press too hard on the wheel and to sit on one side because it would burst. He did not notice the wheel afterwards but says that it ran after that on that day.

Wheel Co. v. Santschi.

These two witnesses—Surtman and Hutchinson—furnish all the testimony in the case as to said defect in the wheel or notice to the company of it. Counsel for defendant in error claim that this is sufficient proof of the negligence of the company, and that however directly or thoroughly they may be contradicted by other witnesses, the jury had their testimony and had the right to believe them.

We notice that while one of the defendant's witnesses was on the stand he was asked, on cross-examination, if he did not say in the presence of a sister of the plaintiff and the plaintiff, when calling on the plaintiff, a few days after he was hurt, that the wheel which burst and hurt the plaintiff had a chunk out of it the day before. He denied having said so, and in rebuttal, Mr. Santschi's sister contradicted him— Santschi not being called for the purpose—and she testified that he did so say on the said occasion. This testimony is not to the main issue, and can in strictness only be considered as affecting the testimony of the witness Strutt; leaving the plaintiff's case to stand upon the testimony of Surtman and Hutchinson as to the defect in the wheel and of Surtman alone as to notice to the company of the defect.

The plaintiff says that he did not notice any defect in the wheel, and was grinding on the side of the wheel, and his counsel argue that the defect could not be seen when the wheel was revolving and that though it was at rest at times during the day—at the noon hour at least, and once when the plaintiff stopped it to oil the machine—it might have stopped so that the broken part was undermost and so would not probably be noticed.

We will now notice some of the considerations urged as showing the improbability of the story of the defect in the wheel.

1. This action was brought on July 24, 1890, Mr. Santschi verifying the petition July 16, 1890. He had gone back to work at the Gendron two or three weeks after he was hurt and worked off and on there five or six weeks, he says. His original petition does not mention a defective wheel but charges negligence only in running the wheel at a dangerous rate of speed whereby it burst. The allegations about the defective wheel were put in long after the original answer and reply were filed, and on leave of the court, on February 9, 1891, by interlineation. It is argued that if the plaintiff knew this fact upon which his case depended, really, he would have mentioned it to his attorneys and they would have been sure to put it in the petition; and also that if this Mr. Strutt had, as claimed, said, in the presence of the plaintiff and his sister, that the wheel had a defect in it the day before and it was then regarded as so important that it was remembered, the plaintiff must have known and remembered it when he filed his petition; and that, at all events, when the plaintiff returned to duty at the shops after so serious an accident, the causes of the accident and the circumstances would have been discussed between him and his fellow workmen and the fact of the defect must have come to his attention, and the fact that he didn't charge it in his petition is strong evidence that no such fact was thought of or known about the shop, and that if such defect had been known to two workmen about the shop, it would have been a matter of general comment among all, and as this was evidently unknown to the plaintiff after being about the shop so soon after his injury and for so long a time, it is urged that there is strong ground for doubting this story of Surtman and Hutchinson.

It is also testified by a foreman of the company that he discharged Hutchinson for coming drunk to the shop, on the day Santschi was hurt, and that Surtman was afterwards discharged for throwing some iron tubing down an elevator.

The story of Surtman is peculiar. He says that the wheel that finally burst was twelve inches in diameter and two to two and a half inches thick. The man who put it in says it was one and one-half inches thick; that it was comparatively a new wheel, having been put on the left end of the shaft of this machine a few days before May 14; that he had ground on it there, off and on, for four or five days, and it was apparently all right till as he was sitting before it, on May 13, this piece came out. It did not hit him, though it would naturally take his direction. It had been ground on when running at a high rate of speed, for several days. There was no suggestion that it had been hit so as to crack this little piece out—nothing to indicate that that little piece flew out of the corner for any other reason than that the wheel was imperfectly compacted and shed pieces by reason of its great velocity—this being so, it would seem strange that it would disintegrate in that way, by detaching an inch and a half piece from the corner, the remainder of the wheel staying intact during its constant use at a like velocity, all the next day till it went all to pieces near night. Mr. Surtman says he realized the danger of being at work on it and refused, on that account, to continue the work. He calls the attention of the foreman to it—the foreman Krete—who testifies that if his attention had been called to it, he would not have allowed it to run and his duty would be to at once take it off; and this foreman walks off without a word, and does nothing to change the wheel. As it happens, the wheel is changed by another man, for another purpose, either that day or the next—probably that day—and on the day that Santschi was injured, Mr. Surtman—who says he refused to work on it on account of its defect and the danger—sits within two feet of it for hours grinding on another wheel of the same machine on the same shaft, where danger would be almost as imminent as when he was grinding on the wheel itself, since the piece that flew out when he was grinding did not hit him, but must have gone to the left of him, and he says that he never called Santschi's attention to the defect nor provided for his own safety and did not know but that any moment Santschi would attempt to grind on the face of the wheel as Surtman had done, instead of on the side. There is no explanation of this conduct of Surtman offered, except that he says that he did not know but that the foreman had told Santschi of the defect. But even if Santschi should be careful to grind only on the side of the wheel, this would not obviate the danger to Santschi, or to Surtman, should other pieces fly out of the wheel or should it go to pieces from its defective character and the velocity of its revolutions.

This conduct of Surtman, as he himself relates it, is so utterly at variance with his statement of what he observed before, as to impel the mind to the conviction that there must be some mistake somewhere. But his position at the wheel on the day of the injury is not only shown by his own testimony but by other evidence and there is no question or controversy about that part of his story.

Again, there was no evidence tending to prove that there was any defect in any wheel other than the one twelve inches in diameter and from one and a half to two and a half inches thick. The plaintiff says that the wheel he was working on—the wheel that burst— was, as he

judges, not more than a half or three-quarters of an inch from the iron table beneath it; that he put his mind to the danger of letting binders get under the wheel, as it might hit him—" break on him."   If the wheel was only a twelve-inch wheel, it is manifest that the binder would not touch it, since with a fourteen-inch wheel, the space is just one-eighth of an inch smaller than the greatest diameter of a binder.   So that a twelve-inch wheel would clear a binder by three-fourths of an inch. So that the plaintiff was mistaken in his testimony as to the wheel being smaller than the fourteen-inch wheel, or in his statement of the distance between it and the table.   He says that during the day he stopped his work at the wheel in order to let persons grind tools upon it, and that they did so; at least two of the defendant's witnesses testify that they did thus grind tools on the face of this stone, and there was no trouble —a thing that would be next to or altogether impossible if such a de ect existed in it.

We think no one can read the record of this case and not feel a decided and irresistible conviction that the truth of the matter was with the claims of the defendant below as to the material facts.   The testi- mony of the defense makes a most satisfactory showing as to how this accident could and probably did happen.   With the testimony of Surt- man and Hutchinson as to the defect in the wheel, does the case present such a mere conflict of testimony as to render it improper for a review- ing court to interfere with the verdict of the jury based, perhaps, upon a belief of the testimony of these men?   Where witnesses on one side of a controversy give testimony which is reasonable and consistent with itself and other witnesses on the other side, contradict the testimony and testify to the contrary matters, we do not deem it proper to disturb the finding of the jury either way, though their finding is contrary to the testimony of the greater number of witnesses, but the probative force of the testimony of any witness is not derived solely from his direct depo- sition as to any given matter, but is rather the final resultant of all his averments bearing on the matter, when considered and analyzed with reference to known circumstances and facts.   This may leave the matter supported not by the full force of the witness' observations but only by such strength as is left in them after they have been weakened by the other statements of the witness himself, or by the known and settled order of things.   We regard the testimony on behalf of the plaintiff in respect to the alleged defect in the wheel as largely self-destroyed, and when we add the power of circumstances sworn to by certain of the defendant's witnesses, and some of them not contradicted, we feel an abiding conviction that the truth of the case as shown by the record, would not justify the verdict rendered, and that to let it stand would be to allow manifest error to triumph over truth.

We have read with great attention the opinion of the court of common pleas in overruling the motion for a new trial, and we think we see in it a recognition of the unsatisfactory character of the finding of the jury and of their estimate of the effect of the evidence, and we regret that the judge of that court did not deem it his duty to set the verdict aside and to grant a new trial.   We think his overruling of the motion for a new trial was erroneous for that the verdict is against the clear and manifest weight of the evidence.

The plaintiff met with a severe injury.   There is no doubt of that.   And perhape there would be a natural desire that those more able than he should help to bear it, but there are misfortunes that come to us

all, which, though hard to endure, must be borne as a part of the ills of life which we must suffer and for which we have no lawful redress against our fellows. Verdicts of juries and judgments of courts must stand upon settled principles which justify them, or not at all.

The said judgment is reversed, the verdict set aside, and the cause is remanded to the court of common pleas for a new trial, and judgment is rendered against the defendant in error for costs and a special mandate is awarded to the court of common pleas for execution thereon.

---

## NEGLIGENCE—DAMAGES.

[Lucas Circuit Court, October 17, 1891.]

ANDREWS V. TOLEDO, ANN ARBOR AND NORTHERN MICHIGAN RY. CO.

1. DUTY OF CONDUCTOR TO KNOW THAT BRAKEMAN IS SAFE BEFORE STARTING TRAIN.

   It is the duty of a conductor, knowing that a brakeman, while cars are standing, is trying to uncouple them, to know that such brakeman is away, or has placed himself where he will be safe, before giving a signal to move the train.

2. SHOULD NOT BE DECLARED AS A MATTER OF LAW, WHAT.

   That "if the plaintiff by the exercise of reasonable care could have kept his arm from between the deadwoods" should not be declared as a matter of law, for it might be safe or it might be dangerous, according to the circumstances.

3. MEDICAL ATTENDANCE, TO BE CONSIDERED AMOUNT EXPENDED SHOULD BE SHOWN.

   A charge that a jury may take into consideration the expense incurred for medical treatment, in the absence of testimony showing the amount of such expenditures, or the obligations incurred for such services, is erroneous.

ERROR to the Court of Common Pleas of Lucas county.

MOORE, J. (orally.)

This case is on error to the court of common pleas of this county. It appears that Peter Andrews obtained a verdict in the court below, and judgment upon it, against the defendant railway company, and it is now sought to reverse that judgment for numerous errors that are assigned as appearing upon the record. Those relied upon by counsel, are, that the court erred in refusing to charge the jury certain propositions that were asked to be charged, and in giving certain propositions to the jury, and that the verdict of the jury below is not sustained by the evidence.

The case is one against a railroad company for negligence. It appears that the plaintiff was a brakeman, an employee of the defendant railway company, and at a time when they were making up trains in the yards of the company in what is called, I believe, the Manhattan yards, was injured. He says that injury was occasioned by the act of the conductor in giving a signal by which the cars of the train were suddenly backed upon him while he was in the act of uncoupling freight cars that were attached to the hind end of the train. That appears to be the act of negligence relied upon for recovery. It is not necessary to detail the averments of the petition at length. Suffice it to say that the claim is made that the conductor, while making up that train, knowing that this brakeman was between the cars in the act of uncoupling them, and the cars were at a stand still and a place of safety, and liable to remain so,